IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JEAN S. HARWOOD,
    et al.,

        Plaintiffs,

                                   Case No. C2-05-828
vs.                                 Judge Edmund A. Sargus, Jr.
                                   Magistrate Judge Terence P. Kemp

AVAYA CORP.,

        Defendant.

## OPINION AND ORDER

Plaintiffs, Sarah Shreve, Sandra Chapman, Melinda Gaddy, Jean Harwood, Sherrie Kendrick, Evelyn Petrus, Michael Prestie, Jr., Daryl Robinson, Jane Rocha and Bonnie Cooper, maintain that they are entitled to payments under their former employer's retention bonus program.[1] Plaintiffs filed a Complaint on August 9, 2005 in the Court of Common Pleas for Franklin County, Ohio alleging: (1) unjust enrichment; (2) breach of contract; and (3) promissory estoppel. Defendant, Avaya Inc., subsequently removed the case pursuant to 28 U.S.C. §§ 1441 and 1446 on the basis of diversity of citizenship.[2] This matter is before the Court for consideration of Defendant's Motion for Summary Judgment. For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**

---

[1]      Three of the original Plaintiffs in this case, Joyce A. Henderson, Dianne Salter and Kathryn Cavagnaro, settled their claims separately and have been dismissed from the action.

[2]      In their Complaint, Plaintiffs denominated Defendant in this case as Avaya Corporation and Avaya Corporation d/b/a Avaya Labs Research–Ohio. The company's proper name, however, is Avaya Inc. The Court will, therefore, refer to the Defendant throughout this Opinion as Avaya Inc.

**I.**

From 1996 to 2000, Plaintiffs in the instant action were employees of Lucent Technologies ("Lucent"). Plaintiffs worked in Lucent's Growing and Emerging Markets ("GEM") division which was engaged in the business of marketing and selling high-technology telecommunications devices. In 2000, Lucent sold its GEM division to Northwestern Corporation ("Northwestern"), a supplier of electric and gas utilities in Montana. Northwestern formed a subsidiary company called Expanets, Inc. ("Expanets") to operate the recently-acquired Lucent assets. Plaintiffs then became Expanets employees as a result of that acquisition.

Expanets employees, including Plaintiffs, received a letter dated April 26, 2000 from Robert DiMartino, Expanets Vice President Human Resources. The letter informed them that Expanets had implemented a retention bonus program for "employees over age 45 who are going to lose their ability to retire with subsidized early retirement benefits from Lucent."[3] DiMartino's letter to Expanets' employees further stated "in the coming weeks, you will receive a personalized statement showing the exact amount of your retention bonus." Attached to this letter was an explanation of the bonus program in a question and answer format called a "Q&A," which indicated that the employee would not need to retire in order to receive the bonus. The Q&A further provided:

> In fact, in order to receive any part of the bonus, you *must* remain with the Company until at least March 31, 2005, at which point you will qualify for the retention bonus. Your choice whether to continue to work after March 31, 2005 will not have any impact on qualifying for the retention bonus.

(*Id.*)

---

[3]     The Plaintiffs verified in their depositions that they had received the letter and attachments. Shreve Depo. 80, Ex. 12; Chapman Depo. 84, Ex. 8; Gaddy Depo. Ex. 10; Harwood Depo. 20, 113-115, Ex. 22; Kendrick Depo. 94, Ex. 20; Petrus Depo. II Ex. 33; Prestie, Jr. Depo. 78, Ex.16; Robinson Depo. 61, Ex. 9; Rocha Depo. 41, Ex. 4; Cooper Depo. 111, Ex. 14; Salter Depo. 81, Ex. 11.

Each Plaintiff received individualized statements reflecting the amount of his or her potential bonus under the "The Expanets Retention Bonus Program" ("ERBP") and additional information from Luke M. Beshar, Expanets Executive Vice President & Chief Financial Officer. The letter provided as follows:

> Although you don't need to retire at any particular time, you must remain an employee with Expanets until at least March 31, 2005 in order to receive this bonus. If your employment terminates for any reason before March 31, 2005, you will not be eligible to receive this bonus.

(Beshar Ltr., undated.)[4]

By late 2003, the market for Expanets' business was in a state of decline. Expanets' parent company, Northwestern, filed for bankruptcy protection. In response to questions about what effect any possible sale of Expanets might have on the future of the ERBP, Tim Atkinson, Expanets Vice President of Legal and General Counsel, sent a letter to Expanets employees which indicated as follows:

> A definitive answer is not possible at this time, and would not be available unless and until a specific transaction and structure is negotiated. . . . In order for the bonus to be paid, the terms require a five year tenure at Expanets with no pro-ration. It is not available to team members who leave Expanets before the five-year anniversary of the GEM purchase, regardless of the circumstances of the departure (resignation, retirement, RIF or termination).

(Atkinson Ltr., undated.)

Throughout its Motion for Summary Judgment, Defendant provides several examples of statements in Q&A's and other correspondence from the company that were made after the original

---

[4]     Shreve Depo. 83-84, Ex. 13; Chapman Depo. 86-87, Ex. 9; Gaddy Depo. Ex. 11; Harwood Depo. 116-118, Ex. 23; Kendrick Depo. 97-99, Ex. 21; Petrus Depo. II 15-21, Ex. 34; Prestie, Jr. Depo. Ex.2;Robinson Depo. Ex.11;Rocha Depo.51,Ex.5; Cooper Depo.116-117,Ex.13;Salter Depo. 87, Ex. 12).

announcement of the ERBP. These post-contract statements made by the employer, however, cannot change the terms of the agreement.

Avaya Inc. is a global provider of telecommunications services. Expanets was a primary sales distributor of Avaya's telecommunications products. In November of 2003, Avaya Inc. formed Avaya LLC to purchase the Expanets's component of Northwestern out of bankruptcy. As part of the consideration for the Expanets sale, Avaya assumed certain liabilities of Expanets, including responsibilities under the ERBP.[5] As a result of that purchase, some of the former Expanets employees became employed by Avaya LLC and then eventually became employed by Avaya Inc. All of the Plaintiffs, with the exception of Sarah Shreve, who was laid off by Expanets on December 31, 2002, almost a year before the acquisition, accepted an offer of employment with Avaya LLC.

When Avaya purchased Expanets' assets, it also acquired the servicing contracts that Expanets held with customers who had Avaya equipment, as well as equipment manufactured by Avaya's competitors. Avaya had its own sales, servicing, accounting and human resources workforces already in place to maintain those service contracts. (Martucci Depo. 9)  Avaya Inc. formed a team to oversee the acquisition of the assets from Expanets to Avaya LLC and then ultimately to Avaya Inc. The team was charged with the duty to assess the Expanets's workforce and to determine whether reductions were necessary if specific business areas were overstaffed. As a result of overstaffing and the inability to sell or service competing non-Avaya products that were contained in Expanets' business portfolio, Avaya LLC determined that it would not be able to retain many of the employees that came over from Expanets. (Martucci Depo. 16, 18-19, 34-35.)

---

[5]     The Asset Purchase and Sale Agreement lists 113 Expanets employees and their corresponding potential retention bonuses as part of the company's liabilities. (Martucci Dep., at pp. 55-56, Exh. 7.)

Avaya Inc. completed the acquisition of the Expanets' assets on November 25, 2003. On November 26, 2003, Thomas A. Lesica, Group Vice President, Global Information Technology and Business Operations for Avaya Inc., sent a letter to Avaya LLC employees which provided that "[w]e cannot maintain the entire Expanets product portfolio indefinitely. . . . We do not yet know exactly how the end-state model will look. We ask for your patience for just a few more weeks as we explore options for the non-Avaya portion of the business and finalize the integration plans." (Lesica Ltr., Nov. 26, 2003.)

In the following weeks, Avaya Inc. continued to evaluate the business' needs, and ultimately determined that the business required significant reductions in force and facility closures. Avaya notified employees that it could not continue to support the sale or servicing of non-Avaya products beyond a short transition period, and that the company would be divesting itself of all or parts of these businesses. On December 17, 2003, Lestica and Chris Younger, former President of Expanets and new Chief Executive Officer of Avaya LLC, issued a letter indicating, among other things, that "[a]ssociates currently aligned with these portions of Avaya LLC will either be recruited by the new businesses or be separated from the business through normal processes." (Younger, Lestica Ltr., 12/03/03.) The letter continued:

> During the past several weeks, Avaya and Avaya LLC leaders have reviewed the skills and performance of employees who currently support Avaya LLC customers, as well as those in corporate functions. We have also carefully considered the size of the workforce required to deliver maximum value to Avaya and its customers. As a result of these reviews, Avaya will offer employment in Avaya Inc. to some of the current Avaya LLC team. Employees who will not be integrated into Avaya Inc. will be exited from the business under the Avaya LLC Separations Plan or facility closings as described below.
>
> We intend to complete the integration of Avaya customers and many of the associates who support those customers into Avaya as early as possible in the first calendar

-5-

quarter of 2004.

We will announce the closure of several Avaya LLC locations as a result of personnel reductions related to divestitures of non-Avaya businesses and the integration of work and people into Avaya Inc.

(*Id.*)

On December 17, 2003, Michele Richter, Senior Manager, Global HR Policy, Force Management and Government Compliance, notified numerous Avaya LLC employees that Avaya LLC anticipated their terminations during late February of 2004. During the months of February and March, 2004, thousands of former Expanets employees, including Plaintiffs Sandra Chapman, Melinda Gaddy, Jean Harwood, Sherrie Kendrick, Evelyn Petrus, Michael Prestie, Jr., Daryl Robinson and Jane Rocha, were laid off by Avaya LLC. Approximately 800 employees of Avaya LLC were offered and accepted positions within Avaya Inc.[6]

Only a small number of persons in the Avaya Human Resources Department knew who among the former Expanets employees was eligible for the ERBP. Those responsible for making the decision regarding who to lay off from Avaya LLC and who to hire into Avaya Inc. did not have that information. (Wong Depo., at p. 47-50.)

Many former Expanets employees who were eligible for the ERBP secured employment with Avaya Inc. and ultimately received the retention bonus.[7] Of the approximately 3,500 former

---

[6]     Of the Plaintiffs, only Bonnie Cooper and Dianne Salter became employees of Avaya Inc. Both Cooper and Salter were terminated prior to March 31, 2005. Ms. Salter has since settled her claims.

[7]     After it had filed its Reply memorandum in support of summary judgment, Avaya filed a Motion for Leave to file the supplemental affidavit of Susan Wong, Vice-President Executive Compensation Benefits and Human Resources Policy for Avaya Inc. In its Motion for Leave, Defendant asserts that, during the discovery phase of this case, it produced a document, bates-stamped Confidential Avaya 2847, identifying employees of Avaya Inc. who received retention bonuses under the ERBP. Defendant intended to properly authenticate this document with the affidavit attached to its Reply, which

Expanets employees, approximately 2,700 were laid off and did not become employees of Avaya Inc. Of the 3,500 former Expanets employees, 113 were eligible for the ERBP. Of the 113 who were eligible, twenty-eight became employed by Avaya Inc. and received the retention bonus. Thus, 85 of the 2,700 laid-off employees were eligible for the retention bonus, but did not receive it because they were not employed by Avaya Inc. on March 31, 2005. Ultimately, Avaya paid $2,183,740 to the twenty-eight employees who received the retention bonus.

---

it submitted without Ms. Wong's signature at the time of filing. Subsequent to the filing of the Reply, Ms. Wong reviewed company records reflecting which employees at Avaya Inc. were paid retention bonuses under the ERBP and discovered that, in addition to all individuals listed on document bates-stamped Confidential Avaya 2847, nine (9) additional employees received retention bonuses. Thus, Defendant asserts that twenty-eight, rather than the nineteen individuals listed on document Confidential Avaya 2847, received the bonus and that the exhibit attached to Ms. Wong's supplemental affidavit is the complete and accurate list of all employees of Avaya Inc. who received the ERBP bonus.

Plaintiffs objected to the Motion for Leave and moved to strike it, asserting that they are prejudiced by the information contained in the supplemental affidavit because, at the time of her deposition, Ms. Wong claimed to be unaware of any list of such employees. Plaintiffs also contend that whether other Expanets employees became employed with Avaya Inc. and received the ERBP bonus is irrelevant to the issue of Defendant's liability for failure to pay them the bonus.

Reviewing Ms. Wong's deposition transcript, the Court notes that she was offered Exhibit 9, which is bates-stamped Avaya 2847 and contains a list of names. Plaintiffs' attorney questioned Ms. Wong as to whether she had seen the list before, to which she indicated that she had not. She did not, as Plaintiffs suggest, deny that she knew anything about a list of employees who had received the bonus, and counsel never asked her if she could compile such a list. She merely could not identify the document. The Court does not detect an inconsistency between Ms. Wong's deposition testimony and the information contained in the supplemental affidavit. Moreover, other than a statement by counsel on the record of Ms. Wong's testimony, wondering if the list was complete, Plaintiffs have pointed to no testimony, and the Court's independent review of the voluminous record likewise reveals nothing to indicate that Plaintiffs otherwise challenged the contents of the document as being inaccurate.

The Court can ascertain no prejudice to Plaintiffs by the disclosure of an additional nine employees, particularly where, as here, Plaintiffs claim that the accurate list of individuals who received the bonus is irrelevant to their claims. In all events, evidence of nine additional Avaya Inc. employees who received the ERBP bonus does not affect the outcome of any dispositve issue in this case. Defendant's Motion for Leave is therefore **GRANTED**; Plaintiffs' Motion to Strike is **DENIED**.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence

-8-

of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

### III.

This Court has jurisdiction under its diversity of citizenship authority, 28 U.S.C. § 1332. The parties are from different states and the amount in controversy exceeds $75,000. In a diversity case, this Court applies the law of the State of Ohio, as interpreted by the Ohio Supreme Court. *Northland Ins. Co. v. Guardsman Prods., Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). However,

> [i]f the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it. If the state appellate court announces a principle and relies upon it, that is a datum not to be disregarded by the federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Id.* (quoting *Clutter v. Johns-Manville Sales Corp.*, 646 F.2d 1151, 1153 (6th Cir. 1981)).

The Ohio Supreme Court has unequivocally spoken regarding the employment-at-will doctrine. Under Ohio law, "the employment relationship between employer and employee is terminable at the will of either; thus, an employee is subject to discharge by an employer at any time, even without cause." *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St.3d 571, 574, 653 N.E.2d 381, 384 (Ohio 1995); *see also Henkel v. Educational Research Council of Am.*, 45 Ohio St.2d 249, 255, 344 N.E.2d 118 (Ohio 1976). In *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 104, 483 N.E.2d 150 (Ohio 1985), the Ohio Supreme Court reaffirmed the at-will employment doctrine, while noting that "facts and circumstances" surrounding the employment may give rise to an altered

-9-

employment relationship.

As explained below, the issue in this Motion is whether an employer which offers a retention bonus payable only if the at-will employee remains employed on a future day may thereafter terminate such employee prior to such date, without paying the retention bonus. No claim is made that the employees otherwise breached the terms of the agreement. The Ohio Supreme Court has not addressed this issue. Consequently, this Court looks to decisions of the various Ohio courts of appeals, as described below.

Initially, this Court notes that the majority of Avaya Inc.'s arguments rest on the proposition that Plaintiffs' work for Expanets and Avaya LLC was at-will. Avaya maintains that it retained the right to terminate the Plaintiffs for any reason that did not run afoul of the law, and that it legitimately dismissed each of the Plaintiffs as part of its reduction-in-force plan. Avaya is correct that, generally, employment in Ohio is presumed to be at-will in the absence of facts or circumstances that indicate an agreement for a specific term. *Henkel v. Education Resource Council*, 45 Ohio St. 2d 241, 344 N.E.2d 118 (Ohio 1976). The employment-at-will doctrine recognizes the right of employers to discharge employees for any reason not contrary to law, and an employee's discretion to leave employment. *Id.*

Plaintiffs here, however, concede that they were at-will employees. They do not seek a remedy for wrongful discharge but instead, seek to enforce a right to a benefit, namely the retention bonus, which they argue that they are due. That Plaintiffs were at-will employees, and both they and Avaya retained the power to terminate employment at any time, does not prevent Plaintiffs from enforcing their rights with respect to a contract ancillary to at-will employment. Thus, as in *Helle v. Landmark, Inc.*, 15 Ohio App. 3d 1, 7-8, 472 N.E.2d 765, 772 (Ohio Ct. App. 6th Dist. 1984):

This case, by contrast [to one involving the application of the at-will doctrine to a dispute over wrongful termination], arises from [the employer's] refusal to pay severance benefits, a form of deferred compensation for continued service, and thus the issue presently before us entails an analysis based upon contemporary contract theory.

. . . .

[E]ven if this were an employment "at-will" case, [the employer's] argument would still lack merit. It is no answer to say that employers cannot become contractually bound by their mere "expressions of policy," oral or written, because then arguably they could no longer freely terminate their employees.

. . . .

The parties' freedom to contract as they see fit should not be circumscribed by an asphyxiative construction of the "at-will" doctrine. This is especially true when the employer's promulgation of policy statements, manuals, handbooks and the like, have instilled in the employee legitimate expectations of benefit in return for his continued service and loyalty.

. . . .

Here, assuming an employment-at-will relationship, it is not necessarily true that [the employer] could have denied appellants their severance benefits by "terminating" their employment one month (or even one day) before closing the . . . facility, for this assertion merely begs the *contract* question. Thus viewed, the "at-will" concept is only a *description* of the parties' prima facie employment relationship. It intimates nothing about subsidiary contractual arrangements (express or implied) to which an employer may legally obligate himself by adding to that relationship new terms and conditions.

*Id.*

## A.    Breach of Contract

Plaintiffs first allege that Avaya assumed responsibility for the ERBP and that it breached the agreement when it failed to pay them the retention bonus or a pro rata share of it at the time of their terminations from employment.[8] They assert that the promise of a retention bonus created a

---

[8]    Notably, however, Sarah Shreve, was laid off from Expanets and did not proceed to Avaya LLC. Shreve's employment was terminated on December 31, 2002. Her potential retention bonus was not included among the list of liabilities that Avaya assumed in the Expanets' asset purchase agreement. Although the parties have not briefed the matter, it appears to the Court that Ms. Shreve is in

unilateral contract, which Avaya was obligated to observe, and that once they began to perform by staying in their jobs, Avaya could not revoke the promise to pay it.

The formation of a unilateral contract typically involves a case in which an offer is made by a party which invites acceptance by performance rather than by a promise to perform. Restatement (Second) of Contracts, § 45, cmt. a (1979). *See also* A. Farnsworth, Contracts § 3.4 (2d ed.1990); 1 Arthur L. Corbin, Corbin on Contracts § 70 (1963). Once an offer for a unilateral contract is made, and part of the requested performance has been rendered by the offeree, the offer cannot be unilaterally revoked or modified. Restatement (Second) of Contracts §§ 25, 45 & cmt. d (1981); 1 Corbin, Contracts § 63 (1952); 1 Williston on Contracts (rev. ed.1990), § 5:13, 691-692.

Plaintiffs contend that a unilateral contract arose in the context of their employment. Indeed, the focus of the ERBP-retention bonus was to induce the workers to stay in the service of the employer for a certain duration. It promised eligible employees a lump sum payment at the end of a specified period of employment.

Ohio courts long ago recognized that an employee bonus plan by which the employer offers to pay a bonus based upon the company's annual net profit gives rise to a contractual obligation on the part of the employer. *Montgomery Ward & Co. v. Smith*, 12 Ohio Law Abs. 28 (Ohio Ct. App. 5th Dist. 1931); *Parish & Bingham Corp. v. Jackson* (1921), 16 Ohio App. 51 (profit-sharing bonus plan created to induce workers "not to quit hastily and before the expiration of the year" would be forfeited if workmen voluntarily quit). "The employer's offer to share profits in consideration of the employee's remaining in the employment and rendering service for a specified time creates a unilateral contract binding upon the employer. Such a plan benefits the employer by acting as an

---

a different position than her co-Plaintiffs.

-12-

inducement to continuous service on the part of his employees." *McKelvey v. Spitzer Motor Center, Inc.*, 46 Ohio App. 3d 75, 77, 545 N.E.2d 1311, 1313 (Ohio Ct. App. 8th Dist. 1988); *see also Helle v. Landmark, Inc.*, 472 N.E.2d at 772, 15 Ohio App. 3d at 7-8 (discussed above).

Corbin on Contracts sets forth the following discussion of unilateral contracts with regard to bonus programs offered by employers:

> The same unilateral contract analysis is applicable to the employer's promise to pay a bonus or pension to an employee in case the latter continues to serve for a stated period. It is now recognized that these are not pure gratuities but compensation for services rendered. The employer's promise is not enforceable when made, but the employee can accept the offer by continuing to serve as requested, even though the employee makes no promise. There is no mutuality of obligation, but there is consideration in the form of service rendered. The employee's one consideration, rendition of services, supports all of the employer's promises, to pay the salary and to pay the bonus. Indeed, although the bonus is not fully earned until the service has continued for the full time, after a substantial part of the service has been rendered the offer of the bonus cannot be withdrawn without a breach of contract.

2 Corbin, Contracts § 6.2 (rev. ed.1995); *see Holland v. Earl G. Graves Pub. Co., Inc.*, 46 F. Supp. 2d 681, 685-86 (E.D. Mich. 1998)(citing Corbin and discussing breach of unilateral employment contract).

Ohio courts of appeals have applied the theory of unilateral contracts in a number of cases involving job benefits. For instance, in *Helle v. Landmark*, the plaintiffs alleged that Landmark, as their employer, breached an oral contract to pay them severance benefits after it closed its business in August 1982. 15 Ohio App. 3d at 3, 472 N.E.2d at 768. They alleged that the benefits were to be paid according to years worked with Landmark and on the condition that they remain with the company until closing. In particular, when faced with an economic downturn in the late 1970's, Landmark began experiencing financial problems and was taken over by a corporate subsidiary. Landmark decided to begin phasing out operations with the ultimate goal of closing the facility

completely. In August of 1981, Landmark established a severance plan for its employees and promulgated the program in its Personnel Policies and Practices Manual. The purpose of the severance policy was to provide monetary benefits to nonunion employees (such as the plaintiffs) whose employment with Landmark might suddenly end if its work force were reduced or its retail facilities shut down. *Id.* at 4. The plaintiffs' manager provided oral assurances that they would receive substantial severance benefits when the Landmark facility closed. Landmark's manual also contained a reservation clause which provided as follows: "The Landmark retails reserve the right to change or rescind, in whole or in part, at any time and without liability to anyone, the policies, principles and practices stated in this manual." *Id.* In December 1981, Landmark unilaterally amended the severance provisions to limit severance pay to a maximum of thirty-five weeks for employees with over twenty-five completed years of service. In June 1982, Landmark again amended the manual and redefined "completed years of service" to mean only those years of employment with Landmark, and not previous years of employment with local associations, such as the company's predecessor. This meant, in effect, that only the plaintiffs' three-year employment with Landmark since the take-over would be used to calculate their severance benefit. The plaintiffs filed a lawsuit seeking to recover the amount of severance pay they would have received under the manual before the June 1982 amendments. *Id.* at 6. In light of the Landmark's argument that the at-will employment doctrine shielded them from all liability related to the employees' discharge, the *Helle* court concluded that the plaintiffs' at-will employment status did not limit the parties's freedom to contract. The court found that Landmark's promulgation of the severance policy had created an enforceable unilateral contract and instilled in the employee legitimate expectations of benefit in

-14-

return for his continued service and loyalty. *Id.* at 7-8.[9]

In *McKelvey,* the plaintiff was a participant in a bonus plan that provided for additional employee compensation based upon the results of a year-end audit. 46 Ohio App. 3d 75, 545 N.E.2d 1311. McKelvey, the plaintiff, was employed for the entire year in question, voluntarily terminating his employment on February 10, 1983. The employer denied the plaintiff compensation under the plan on the basis of a clause that provided that an employee must be employed on the date of the completion of the audit, which was finalized on March 10, 1983. The court held that the bonus had vested despite fact that employee voluntarily left employment and was not employed at the time the bonus was paid out as required by bonus plan agreement. According to the Court, "once an employee has completed his services for the year and there was a net profit, as provided by the bonus plan, [the] employee is entitled to the bonus, irrespective of the date when the employer decided to make the bonus payable." *Id.* at 1314; *see also Wall v. Pizza Outlet, L.P.*, 2002-Ohio-3483, 2002 WL 1467782 (Ohio Ct. App. 5th Dist. 2002) (holding that bonus had vested despite fact that employee voluntarily left employment and was not employed at the time the bonus was paid out as required by bonus plan agreement).

As noted *supra*, this Court, while sitting in diversity, applies Ohio law as interpreted by the Supreme Court of Ohio. In this case, the issue presented has not been addressed by the Ohio Supreme Court. This Court therefore looks to decisions from the Ohio courts of appeals. These cases, as described above, represent the controlling law of Ohio.

---

[9]     In *Helle*, the court focused on the plaintiffs' promissory estoppel claims based primarily on the fact that the plaintiffs had received series of oral assurances of severance pay from Landmark's agents. In this case, by contrast, Plaintiffs do not rely on oral promises from their employer regarding their right to the retention bonus.

The cases cited by Defendant are not from the Ohio Supreme Court or the Ohio courts of appeals, are factually distinguishable and do not address whether an employer's offer of a retention bonus creates a unilateral contract. For instance, in *Guerrero v. J.W. Hutton, Inc.*, 458 F.3d 830 (8th Cir. 2006), plaintiff brought suit against her former employer asserting rights under a bonus program. The bonus program stated "[a]n employee must be employed through the last working day of the quarter to be eligible for the bonus." Guerrero was terminated via letter effective June 27, 2003, three days short of the last working day of the second quarter, although she appeared for work on June 30th, unaware that her employment had been terminated. The court, however, focused on whether Guerrero actually was "employed" on June 30, 2003, and neither the parties nor the court raised the issue of whether the employer had extended an offer of a unilateral contract with its bonus program.

Similarly, neither *Coker v. Carrier Corp.*, 2006 WL 1491247 (E.D. Tenn., May 24, 2006) and *France v. Syngenta Corp. Protection, Inc.*, 80 Fed. Appx. 238, 2003 WL 22490392 (3rd Cir. Nov. 4, 2003), address the issue of whether an employer's offer of a retention bonus in exchange for the employee's performance by staying on the job constitutes a unilateral contract. Each case assumes, without so stating, that the bonus programs at issue are bilateral contracts subject to a condition that the employee be employed on a date certain, which, the courts found, plaintiffs did not fulfill.

In *Choi v. AEP Energy Servs., Inc.*, 132 Fed. Appx. 699, 700-01, 2005 WL 1182365 (9th Cir. May 19, 2005), a case governed by Ohio law, the plaintiffs argued that they "earned" bonuses under the terms of an incentive compensation plan which required that "the company satisfied financial targets and the employee remained employed at the time of the payout." *Id.* The court noted that

"Ohio courts will enforce preconditions in written bonus or commission contracts even where doing so appears to work a hardship on the employee." *Id.* at 701. Finding that plaintiffs had been employed only nine of the eighteen months required by their employment letters to obtain an incentive bonus, and that none remained with AEP at the end of the plan year, the court held that the preconditions of the contract had not been fulfilled. In *Choi*, however, AEP expressly reserved and exercised the right to terminate both the incentive plan and the plaintiffs' employment prior to the end of the plan year. *Choi* is also distinguishable in that the plaintiffs were not offered a bonus in exchange for their agreement to stay with the company, but rather were eligible to participate in the program as an incentive or reward for production.[10]

This Court concludes that the ERBP was an offer for a unilateral contract. It was an announcement of a retirement subsidy in the form of a retention bonus to certain employees if they remained employed until the payment date. It was designed to, and in fact did, induce Plaintiffs to stay with the companies so as to provide continuity and expertise during transitions. It is not without significance that the written terms of the retention bonus proposal made no mention that the employer retained the right to layoff the employees otherwise eligible for the retention bonus. Plaintiffs accepted the offer through their performance, by staying on with the companies as they transitioned from Lucent, Expanets and, ultimately, to Avaya. These Plaintiffs worked between 16

---

[10]     Defendants also cite *Cooper v. Ameritex Yarn, LLC*, 2005 WL 3240653 *1 (D.S.C. Nov. 28, 2005) in support of their argument. Although the plaintiff raised the claim that the employer had created a unilateral contract which it breached when it unjustifiably impeded his ability to perform by firing him, the court gave no treatment to that argument. Instead the court found that the employer was only obligated to pay if the plaintiff condition of being employed on the pay-out date, which he indisputably was not. This Court is not persuaded in this case that the analysis for determining whether Avaya breached the retention-bonus promises by discharging employee before they could fulfill its conditions by remaining employed until the payment date is so elementary.

and 30+ years for the companies before they were laid off. Although the bonus was not fully earned until March 31, 2005, Plaintiffs rendered a substantial part of the service such that the offer of the bonus could not be revoked without a breach of contract. Avaya's termination of the employees prevented them from satisfying the condition requiring completed performance. *See Dynes Corp. v. Seikel, Koly & Co., Inc.*, 100 Ohio App. 3d 620, 654 N.E.2d 991 (Ohio Ct. App. 8th Dist. 1994)(holding that nonperformance of condition is excused where performance is prevented by other party); *see also Shaw v. Avaya, Inc.*, Case No. SA CV 04-1313, at p. 20 (C.D. Ca. May 26, 2006) (unreported)(finding that the termination of Avaya LLC employees before customers paid in-full, a post-sale event which triggered commissions, prevented and excused them from performance).

In summary, despite the fact that the Plaintiffs were at-will employees, the Defendant offered these employees a substantial bonus, if the employees continued their employment with an ailing company to a specific, future date. The offer made no mention that the bonus would be extinguished if the employer laid off the employees. The bonus was conditioned on the employees remaining employed with the Defendant through a particular date, which the Plaintiffs undisputedly intended to do. The Defendant prevented the employees from meeting the one condition necessary to obtain the bonus, the continuation of employment. As Corbin, *supra,* notes, contract law is not so one-sided as to permit one party to induce the other's substantial, part performance and thereafter allow the inducing party to simply, unilaterally, terminate the agreed-upon arrangement.[11]

---

[11]     The Court does not address an issue not involved in this case, which involves the circumstances under which an employee, having partly performed, is working towards a retention bonus and nonetheless engages in conduct that could be an independent breach of both the conditions of employment and the implied conditions of the retention bonus.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiffs' breach of contract claim is denied.

**B.     Promissory Estoppel and Unjust Enrichment**

Because an enforceable contract governed relations between the parties, Plaintiffs' equitable claims for promissory estoppel and unjust enrichment are barred.  Promissory estoppel is an alternative theory of recovery to a breach of contract claim. It is an equitable doctrine resorted to for the enforcement of promises that are noncontractual and otherwise unenforceable. "It is generally agreed that there can not be an express agreement and an implied contract for the same thing existing at the same time." *Hughes v. Oberholtzer,* 162 Ohio St. 330, 335, 123 N.E.2d 393 (Ohio 1954). Promissory estoppel is not available as a remedy where the legal relationship between the parties is governed by a valid and enforceable contract. *Gibson Real Estate Mgt., Ltd. v. Ohio Dept. of Admin.,* 2006 WL 322304 (Ohio Ct. Cl., Jan. 04, 2006); *Warren v. Trotwood-Madison City Sch. Dist. Bd. of Educ.,* 1999 WL 148233 (Ohio Ct. App. 2d Dist. Mar. 19, 1999)("Promissory estoppel is inconsistent with the existence of an express written contract.") Similarly, the doctrine of unjust enrichment does not apply where a valid, enforceable contract exists.   *University Hospitals of Cleveland, Inc. v. Lynch,* 96 Ohio St.3d 118, 130, 772 N.E.2d 105 (Ohio 2002).

Because the Court has found that the relationship between the parties is contractual and the terms of the contract control any dispute, Defendant is entitled to judgment as a matter of law on Plaintiffs' promissory estoppel and unjust enrichment claims.

**IV.**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. # 41) is

**GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

    **May 25, 2007**                                       *Edmund A. Sargus, Jr.*
**DATED**                                             **EDMUND A. SARGUS, JR.**
                                                          **UNITED STATES DISTRICT JUDGE**