**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JEAN S. HARWOOD,**
      **et al.,**

           **Plaintiffs,**

                           **Case No. C2-05-828**
      **vs.**                    **Judge Edmund A. Sargus, Jr.**
                           **Magistrate Judge Terence P. Kemp**

**AVAYA INC.,**

           **Defendant.**

## OPINION AND ORDER

On May 25, 2007, the Court issued its Opinion and Order granting in part and denying in part Defendant's Motion for Summary Judgment. Following issuance of the Order, the parties agreed to submit simultaneous briefs on the issues of liability and damages as they relate to Plaintiff Shreve, in particular, and to the remaining Plaintiffs, in general. Plaintiffs expressly withdrew their demand for a jury trial, and the parties submitted the case to the Court for disposition and final judgment. This matter is now before the Court on Plaintiffs' Motion for Summary Judgment, and Defendant's Brief Regarding Claims Brought by Plaintiff Sarah Shreve and Regarding Damages.

**I.**

The parties have stipulated that "the record presented to the Court on Defendant's [previous] Motion for Summary Judgment is sufficient to decide all issues remaining and pending for trial including the issues of liability and damages, as if both parties moved for summary judgment on those issues." (Stipulation of the Parties, Doc. #85.) From this record, the Court finds the following facts are relevant to the remaining issues.

Shreve became an employee of Expanets, Inc. in 2000 after the sale of Lucent Technologies Growing and Emerging Markets division to Northwestern Corporation. On October 29, 2003, Avaya Inc. purchased Expanets's assets at a bankruptcy auction. On November 25, 2003, Avaya Inc. closed on the acquisition of Expanets. Avaya Inc. ultimately assumed all the terms and conditions of the "The Expanets Retention Bonus Program" ("ERBP") with the purchase of Expanets. As set forth in the Court's previous Opinion and Order, pertinent to this dispute, the ERBP implemented a retention bonus program for "employees over age 45 who are going to lose their ability to retire with subsidized early retirement benefits from Lucent."[1] Attached to the announcement of the ERBP was an explanation of the bonus program in a question and answer format called a "Q&A," which provided as follows:

> In fact, in order to receive any part of the bonus, you *must* remain with the Company until at least March 31, 2005, at which point you will qualify for the retention bonus. Your choice whether to continue to work after March 31, 2005 will not have any impact on qualifying for the retention bonus.

(*Id.*) Nowhere else in the agreement did the employer retain the right to terminate, without cause, a covered employee and thereby extinguish the obligation to pay the bonus.

Schedule 5.21(b) to the Asset Purchase Agreement listed the former Expanets employees who had accepted offers of employment with Avaya LLC and who were eligible for the ERBP, including their corresponding retention bonus amounts. (Martucci Dep. Exh. 7.) Avaya Inc. assumed the responsibilities with regard to the ERBP expressly set forth in Schedule 5.21(b). (Martucci Depo. Exh. 7). The Agreement also specifically disclaimed liabilities not listed in

---

[1] The Plaintiffs verified in their depositions that they had received the letter and attachments. Shreve Depo. 80, Ex. 12; Chapman Depo. 84, Ex. 8; Gaddy Depo. Ex. 10; Harwood Depo. 20, 113-115, Ex. 22; Kendrick Depo. 94, Ex. 20; Petrus Depo. II Ex. 33; Prestie, Jr. Depo. 78, Ex.16; Robinson Depo. 61, Ex. 9; Rocha Depo. 41, Ex. 4; Cooper Depo. 111, Ex. 14; Salter Depo. 81, Ex. 11.

Schedule 5.21(b).  In particular, the Agreement provided that, "[e]xcept as set forth on Schedule 5.21(b), neither the Company nor any of its Subsidiaries has entered into and is not bound by any (i) employment, consulting or severance Contract with any of its directors, officers or employees. . . ."  (*Id*.) Plaintiff Shreve, who had been laid off the year before by Expanets, was not listed in Schedule 5.21(b).[2]

Based on the evidence of record, including the Plaintiffs' affidavits and Schedule 5.21(b) of the Asset Purchase Agreement, the Court derives the following information regarding each Plaintiff and their potential retention bonus amounts:

| A | B | C | D |
|---|---|---|---|
| *Employee* | *Full Retention Bonus* | *Number of days from start to end of bonus multiplied by number of days employee worked[3]* | *Prorated portion of the retention bonus* |
| Sandra M. Chapman | $68,240 | ÷ 1825 x 1415 | $52,909 |
| Bonnie Cooper | $112,321 | ÷ 1825 x 1619 | $99,643 |
| Melinda Gaddy | $39,332 | ÷ 1825 x 1390 | $29,957 |
| Jean Harwood | $75,569 | ÷ 1825 x 1415 | $58,592 |
| Sherrie Landsberger Kendrick | $81,346 | ÷ 1825 x 1404 | $62,581 |

---

[2]      Shreve was not a party to this Agreement, and her right to a remedy for remedy for breach of contract would not arise by virtue of it.  Rather, Shreve's ability to collect damages for breach of contract depends on whether Avaya Inc. assumed this potential liability.

[3]      Although they now argue against proration altogether, Plaintiffs' affidavits each suggest that if the amount of their bonuses is to be pro rated, the divisor should be 1825, which represents the number of days in five (5) years (365 x 5).  Defendants suggest the figure of 1780 as the number of days from the effective date of the bonus until March 31, 2005.  The Court cannot determine the basis for Defendant's calculation.  The record indicates that Expanets intended for the bonus to apply from the date it purchased Lucent, March 31, 2000, for an additional five years, or 1825 days later.

-3-

| Evelyn Petrus | $102,117[4] | ÷ 1825 x 1415 | $79,176 |
| Michael Prestie, Jr. | $59,596[5] | ÷ 1825 x 1390 | $45,391 |
| Daryl Robinson | $56,634 | ÷ 1825 x 1390 | $43,135 |
| Jane Rocha (Roderick) | $26,901 | ÷ 1825 x 1377 | $20,297 |
| Sarah S. Shreve | $294,000 | ÷ 1825 x 979 | $157,713 |

Column B lists the amount of the bonus promised if the employee worked the entire five-year period. Column C lists the number of days each employee worked after the beginning of the five-year period commencing March 31, 2000. Column D is a proration of the numbers listed in Column B, based upon the percentage of the five-year period required for the bonus worked by each employee.

## II.

### A. Shreve's Breach of Contract Claim

Following the Court's previous Opinion and Order, Shreve's remaining claim is for breach of contract. Plaintiff Shreve now moves for summary judgment on the claim.[6] Avaya Inc. contends that Shreve's breach of contract claim fails as a matter of law, because Avaya Inc. never assumed any responsibility with regard to Shreve under the ERBP.

---

[4]     Plaintiffs' Motion indicates that the amount of Petrus' bonus was to be $118,000. She avers in her affidavit, however, that she was to receive $102,117, and the amount is confirmed by Schedule 5.21(b) of the Asset Purchase Agreement. Petrus' Aff., at ¶ 6.

[5]     Plaintiffs' Motion indicates that the amount of Prestie's bonus was to be $60,000. He avers in his affidavit, however, that he was to receive $59,596, and the amount is confirmed by Section 5.21(b) of the Asset Purchase Agreement. Prestie's Aff., at ¶ 5

[6]     The Court notes that Defendant's previous Motion for Summary Judgment related to all Plaintiffs and all of their claims. The Court construes Defendant's previous Motion, together with its brief regarding claims against Plaintiff Sarah Shreve, as a Motion for Summary Judgment directed at Shreve's remaining breach of contract claim under Federal Rule of Civil Procedure 56.

"The well-recognized rule of successor liability provides that the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Industries, Inc. v. Applied Companies*, 67 Ohio St. 3d 331, 334, 617 N.E.2d 1129, 1132 (Ohio 1993)(citing *Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60, 62, 507 N.E.2d 331, 334 (Ohio 1987)). A successor corporation may be held liable only when "(1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a *de facto* consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." *Welco*, 617 N.E.2d at 1132 (citing *Flaugher*, 507 N.E.2d at 334)(noting also that the rule and four traditional exceptions evolved in non-product liability cases involving matters such as contracts).[7]

---

[7]     Plaintiff Shreve suggests that the Court should apply corporate-successor liability broadly, as the state courts have done in matters relating to products liability.  Although the Ohio Supreme Court considered the policy rationales for expanding corporate-successor liability in product-tort cases, including the fact that manufacturers, for example, are in a better position than consumers to bear and spread the costs of injuries caused by their products, the Court declined to broaden liability in matters involving contract:

> However valid the justifications for expanding the liability of successor corporations in products liability cases, those justifications do not apply here. Unlike tort law, which is guided largely by public policy considerations, contract law looks primarily to the intentions of the contracting parties. . . . The concerns for predictability and free transferability in corporate acquisitions that led this court to decline to expand the test for tort successor liability in *Flaugher* are even more compelling where the claim is in contract. To expand the mere-continuation exception to a contractual claim would virtually negate the difference between an asset purchase and a stock purchase. Courts would be forced to look beyond the surface of any asset purchase to determine the extent of shared features between predecessor and successor in order to decide whether liability should attach to contractual obligations that were explicitly excluded from the transaction. The sale of a corporation's assets is an important tool in raising liquid capital to pay off corporate debts. A court-imposed expansion of contractual liability of successor corporations beyond the traditional exceptions would unnecessarily chill the marketplace of corporate acquisitions. For these reasons, we decline to expand the traditional exceptions to the general rule of nonliability of successor corporations . . . .

*Welco*, 67 Ohio St. 3d at 348-49, 617 N.E.2d at 1333 (citations omitted).

Here, Shreve has failed to demonstrate any of the exceptions to the general rule that a corporate purchaser is not liable for the debts and obligations of the seller corporation. First, Plaintiff Shreve has adduced no evidence that Avaya Inc. expressly or impliedly agreed to assume any liability with regard to her. Rather, the Asset Purchase Agreement specifically listed those former Expanets employees who were eligible for the ERBP, and did not include Shreve among the names of those who were potentially due the bonus. As such, Avaya Inc. did not expressly assume contractual liability with regard to Shreve under the ERBP. *See Howell v. Atlantic-Meeco, Inc*., Case No. 01CA0084, 2002 WL 857685 *3 (Ohio App. 2d Dist. April 26, 2002) (holding "[r]egarding the first *Flaugher/Welco* exception, whether the buyer corporation expressly or impliedly agreed to assume liability, the . . . purchase agreement specifically lists the liabilities that [successor corporation] assumed through the deal. The agreement says nothing of [the successor corporation's] liability for defects in [the predecessor corporation's] products"); *Welco*, 617 N.E.2d at 1134 (holding that "[i]t is clear that Vickers [the successor corporation] did not expressly assume any contractual liability to Applied. The purchase agreement expressly disclaimed both Welco's rights in its claim against Applied and its liability in the counterclaim").

The evidence also demonstrates that the transaction between Expanets and Avaya Inc. did not constitute a *de facto* consolidation or merger. "A *de facto* merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." *Welco*, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134 (citing *Flaugher*, 30 Ohio St.3d at 71, 507 N.E.2d at 340 (A.W. Sweeney, J., dissenting)).

The hallmarks of a *de facto* merger include (1) the continuation of the previous

-6-

business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations.

*Welco*, 67 Ohio St. 3d at 349, 617 N.E. 2d at 1134 (citing *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 420, 244 N.W.2d 873, 879 (Mich. 1976)).

Once Avaya Inc. completed the acquisition of the Expanets' assets, management notified employees that the company could not maintain the entire Expanets-product portfolio indefinitely. Avaya ultimately determined that it required significant reductions in force and facility closures. Avaya notified employees that it could not continue to support the sale or servicing of non-Avaya products beyond a short transition period, and that the company would be divesting itself of all or parts of these businesses.[8]   Approximately 2,700 of the 3,500 former Expanets employees were laid off.  Because most of the former Expanets employees were laid off, many of the former Expanets locations were closed, and much of the operations related to non-Avaya products ceased, the evidence does not support the conclusion that Avaya Inc. continued Expanets' previous business

---

[8]     Plaintiff argues that Martucci testified directly in his deposition that Expanets was "integrated" into Avaya when it was purchased.  Martucci actually said that he was employed by Avaya and that "[w]hen Avaya did the acquisition we needed somebody over there to continue to run the company for Avaya until which time the integration of Expanets into Avaya was completed . . . ." He explained that Expanets was a distributor of Avaya products, and other sold other non-Avaya products. He further testified that,

> When Avaya acquired Expanets, we were basically acquiring the contracts that they had with ongoing customers who had Avaya equipment and acquiring those contracts and servicing our equipment.  We had the sales force, service force, accounting force and HR force already in place to service those contracts, so in doing so, we were protecting our installed base, but not necessarily hiring, going to keep all the employees form that because we already had wherewithal to continue this business without bringing in all the employees on.

(Martucci Dep., at p. 16.)

activity and maintained its corporate personnel.  The evidence does not suggest a "basic continuity of the seller's enterprise, including the retention of key personnel, assets, physical location, general business operations."  *McGaw v. South Bend Lathe, Inc.*, 74 Ohio App.3d 8, 11, 598 N.E.2d 18, 20 (Ohio Ct. App. 1st Dist. 1991)(citing *Turner*, 97 Mich. at 420, 244 N.W.2d at 879).  Additionally, there is no evidence of any continuity of shareholders or an assets-for-stock exchange. Nor did the selling corporation dissolve immediately.

Avaya Inc. did not assume the obligations of Expanets necessary for uninterrupted business operations and is not a mere continuation of Expanets.  A successor corporation is a mere continuation of the predecessor when "'"one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation. This is actually a reorganization.'" *Welco*, 67 Ohio St. 3d at 350, 617 N.E.2d at 1134 (quoting *Turner*, 97 Mich. at 449, 244 N.W.2d at 892).  Contrary to Plaintiff's argument, the evidence, in fact, controverts the suggestion that Avaya Inc. is merely a continuation Expanets.[9]

The undisputed facts demonstrate that Avaya Inc. is not liable for the contractual liabilities of Expanets under any of the traditional exceptions to the rule of non-liability of corporate successors. Summary judgment is thus appropriate for Avaya Inc. on Shreve's breach of contract claim.  For these reasons, Plaintiff Shreve's Motion for Summary Judgment as to her claim is

---

[9]    The *Welco* decision suggests that courts should be assured from the record that the parties did not enter into the purchasing transaction "with fraudulent intent to escape liability."  *Welco*, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134.  Here, there is no indication that the parties entered into the Asset Purchase Agreement fraudulently for the purpose of escaping liability.  Plaintiff Shreve does not contend that she is entitled to relief under this theory or assert that the purchase price for Expanets was unfair or the result of anything but arm's-length negotiations.

**DENIED**.   Defendant's Motion for Summary Judgment as to Plaintiff Shreve's claim is

**GRANTED**.

**B.      Remaining Plaintiffs' Motion for Summary Judgment for Breach of Unilateral
          Contract**

As to the remaining Plaintiffs, Defendant contends that, even if Plaintiffs had a contractual

right to the ERBP while employed by Expanets, they gave up that right in exchange for employment

with Avaya LLC when they accepted the terms of the November 13, 2003 offer letter.  Avaya Inc.,

however, assumed the contractual responsibilities of  the ERBP as expressly set forth in Schedule

5.21(b) of the Asset Purchase Agreement.  (Martucci Depo. Exh. 7).  Schedule 5.21(b) to the Asset

Purchase Agreement listed the former Expanets employees who had accepted offers of employment

with Avaya LLC and who were eligible for the ERBP, including their corresponding retention bonus

amounts. (Martucci Depo. Exh. 7).  Each of the Plaintiffs, with the exception of Shreve, was listed

on the Schedule.  Thus, to the extent Expanets owed any contractual obligation to Plaintiffs under

the ERBP– unilateral or otherwise– Avaya Inc. assumed it when the corporate-purchase transaction

closed.[10]   The Court rejects Defendant's argument that whatever rights to the ERBP Plaintiffs

possessed vis-a-vis the contracts with Expanets, they agreed to give up those rights in exchange for

employment with Avaya under the terms of the November 13, 2003 offer letter.  The fact that

Plaintiffs accepted Avaya LLC's offer of at-will employment did not, in and of itself, vitiate the

effect of the contractual obligations that Avaya assumed when it purchased Expanets' assets.

In its previous Opinion and Order, this Court determined that Plaintiffs' status as at-will

---

[10]      Notably, Section 5.21(b) of the Asset Purchase Agreement is captioned "Employment
Agreements," and expressly states that "[e]xcept as set forth on Schedule 5.21(b), neither the Company
nor any of its Subsidiaries has entered into and is not bound by any (i) employment . . . Contract with any
of its . . . employees . . . ."  (Marcucci Dep., Exh. 7.)

employees, in which both they and Avaya retained the power to terminate employment at any time, did not prevent them from enforcing their rights with respect to separate or supplemental contracts, even if those agreements related to their employment. Again, the Court adopted the line of cases in Ohio which stand for the proposition that employers and employees-at-will may enter into separate contractual relationships:

> Here, assuming an employment-at-will relationship, it is not necessarily true that [the employer] could have denied appellants their severance benefits by "terminating" their employment one month (or even one day) before closing the . . . facility, for this assertion merely begs the *contract* question. Thus viewed, the "at-will" concept is only a *description* of the parties' prima facie employment relationship. It intimates nothing about subsidiary contractual arrangements (express or implied) to which an employer may legally obligate himself by adding to that relationship new terms and conditions.

*Helle v. Landmark, Inc*., 15 Ohio App. 3d 1, 7-8, 472 N.E.2d 765, 772 (Ohio Ct. App. 6th Dist. 1984).

The Court determined that a unilateral contract existed between Expanets and Plaintiffs, and emphasized that, when Expanets offered the incentive bonus which would vest in five years, it expressed a promise in which it did not reserve the right to terminate the program:

> This Court concludes that the ERBP was an offer for a unilateral contract. It was an announcement of a retirement subsidy in the form of a retention bonus to certain employees if they remained employed until the payment date.  It was designed to, and in fact did, induce Plaintiffs to stay with the companies so as to provide continuity and expertise during transitions.  It is not without significance that the written terms of the retention bonus proposal made no mention that the employer retained the right to layoff the employees otherwise eligible for the retention bonus.  Plaintiffs accepted the offer through their performance, by staying on with the companies as they transitioned from Lucent, Expanets and, ultimately, to Avaya.  These Plaintiffs worked between 16 and 30+ years for the companies before they were laid off.  Although the bonus was not fully earned until March 31, 2005, Plaintiffs rendered a substantial part of the service such that the offer of the bonus could not be revoked without a breach of contract.  Avaya's termination of the employees prevented them from satisfying the condition requiring completed performance. *See Dynes Corp. v. Seikel, Koly & Co., Inc*., 100 Ohio App. 3d 620,

654 N.E.2d 991 (Ohio Ct. App. 8ᵗʰ Dist. 1994)(holding that nonperformance of condition is excused where performance is prevented by other party); *see also Shaw v. Avaya, Inc*., Case No. SA CV 04-1313, at p. 20 (C.D. Ca. May 26, 2006) (unreported)(finding that the termination of Avaya LLC employees before customers paid in-full, a post-sale event which triggered commissions, prevented and excused them from performance).

          In summary, despite the fact that the Plaintiffs were at-will employees, the Defendant offered these employees a substantial bonus, if the employees continued their employment with an ailing company to a specific, future date. The offer made no mention that the bonus would be extinguished if the employer laid off the employees. The bonus was conditioned on the employees remaining employed with the Defendant through a particular date, which the Plaintiffs undisputedly intended to do. The Defendant prevented the employees from meeting the one condition necessary to obtain the bonus, the continuation of employment. As Corbin, *supra,* notes, contract law is not so one-sided as to permit one party to induce the other's substantial, part performance and thereafter allow the inducing party to simply, unilaterally, terminate the agreed-upon arrangement.

(Opinion & Order, 5/25/07, at p. 17-18.)[11]  In summary, as at-will employees, the Plaintiffs could

---

[11]     Courts have used unilateral contract analysis to determine whether an employer's promise regarding compensation to an at-will employee is enforceable. *See, e.g., Levy v. Lucent Technologies, Inc*., 2003 WL 118500 (S.D. N.Y. Jan. 14, 2003); *Popovich v. Bekaert Corp*., 222 Ga. App. 395, 474 S.E.2d 286, 288 (Ga. Ct. App.1996) ("[A]n additional compensation plan offered by an employer and impliedly accepted by an employee, by remaining in employment, constitutes a contract between them ...." (internal quotation marks omitted)); *Cunningham v. 4-D Tool Co.*, 182 Mich. App. 99, 451 N.W.2d 514, 517 (Mich. Ct. App.1989) ("Employment contracts can generally be described as unilateral contracts, a unilateral contract being one in which the promisor does not receive a promise in return as consideration. The employer makes an offer or promise which the employee accepts by performing the act upon which the promise is expressly or impliedly based. The employer's promise constitutes, in essence, the terms of the employment agreement; the employee's action in reliance upon the employer's promise constitutes sufficient consideration to make the promise legally binding." (citations omitted)); *Leone v. Precision Plumbing & Heating, Inc*., 121 Ariz. 514, 591 P.2d 1002, 1004 (Ariz. Ct. App.1979) ("It is undisputed that if continued employment is bargained for in making a bonus offer, continued employment is sufficient consideration."); *Fries v. United Mine Workers*, 30 Ill.App.3d 575, 333 N.E.2d 600, 604 (Ill. App. Ct.1975) (enforcing employer's promise to pay pension to employee noting that "[a]n employee may accept an offer of a pension by continuing to work"); *see also* Mark Pettit, Jr., MODERN UNILATERAL CONTRACTS, 63 B.U. L.Rev. 551 (1983) (noting the widespread judicial use of unilateral contract analysis in employment cases); Peter Meijes Tiersma, REASSESSING UNILATERAL CONTRACTS: THE ROLE OF OFFER, ACCEPTANCE AND PROMISE, 26 U.C. Davis L. Rev. 1 (1992)(addressing injustice in allowing revocation of unilateral contract after offeree has begun performance and suggesting that the spoken promise of the offeror, as opposed to complete performance, is sufficient to bind the speaker from the moment it is made).

be terminated at any time.  As to the promised bonus, however, the terms were binding.

Avaya Inc. assumed the ERBP contracts from Expanets and any corresponding liability for the breach or repudiation thereof.  Having assumed the contracts, Avaya Inc., therefore, could not revoke the bonus program.  The remaining Plaintiffs' Motion for Summary Judgment on their claim of breach of contract is, therefore, **GRANTED**.

**C.     Damages**

There is little debate regarding the legal consequences of an offeree's completion of the requested performance of a unilateral contract.  Expectation damages are awarded for a breach after the offeree has accomplished all that he or she was obliged to do, and the unilateral contract is completed by full performance.  Theorists and the courts, however, have engaged in considerable debate as to the effect of partial performance.

The Restatement (Second) of Contracts, § 45 incorporates the notion that once an offeree begins to perform a unilateral contract, the offeror may no longer revoke.  Section 45 provides as follows:

> (1) Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it.
>
> (2) The offeror's duty of performance under any option contract so created is conditional on completion or tender of the invited performance in accordance with the terms of the offer.

Restatement (Second) of Contract § 45 ( Revocation of Offer For Unilateral Contract; Effect Of Part Performance Or Tender).  "An option contract is a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer."  Restatement (Second) of Contracts, § 25. Thus, Section 45 creates an option contract when the offeree tenders or begins

the invited performance, effectively making the offer irrevocable. Although Section 45 contemplates that, after an option contract is created, the offeror's duty to perform is conditioned upon completion or tender of the invited performance, comment e suggests that full performance may be excused if the offeror prevents or waives performance or repudiates:

> e. Completion of performance. Where part performance or tender by the offeree creates an option contract, the offeree is not bound to complete performance. The offeror alone is bound, but his duty of performance is conditional on completion of the offeree's performance. . . . But the condition may be excused, for example, if the offeror prevents performance, waives it, or repudiates. See Comment b to § 225 and §§ 239, 278.

Restatement (Second) of Contracts, § 45 cmt. e.

In this case, the Court has determined that Avaya Inc. assumed liability for the unilateral or option contracts set forth in the ERBP, and that Avaya Inc. prevented Plaintiffs' ability to completely perform under the agreement by terminating them prior to March 31, 2005. That is, Avaya Inc. discharged the employees before they could fulfill the conditions of the contract by remaining employed until the payment date. Moreover, the Court has concluded that Avaya Inc.'s termination of Plaintiffs' employment constituted a repudiation and breach. The Court, therefore, must determine the appropriate compensation for these Plaintiffs who have substantially, but only partly, performed.

In fashioning a remedy for the repudiation or breach in this case, the Court notes that full expectation damages are not necessarily inappropriate due to uncertainty or speculativeness. The parties do not dispute that Plaintiffs wanted to complete the performance that would entitle them to payment. The Asset Purchase Agreement listed the amount of each employee's potential bonus, and the parties do not dispute the full sum of the retention bonus. Indeed, courts in Ohio have granted full expectations damages, even before completed performance. In *Parish & Bingham Corp. v.*

*Jackson*, 16 Ohio App. 51 (Ohio Ct. App. 8th Dist. 1921), an employer had promised an employee a share of profits at the end of the year, but discharged the employee prior to the end of the year. The court held that the plaintiff had the right to regard the contract as one for a year and awarded damages not only for the time he had actually worked, but also for the remainder of the employment term.

Avaya Inc. contends that none of the Plaintiffs worked until March 31, 2005 and, therefore, none is entitled to the full amount of the bonus. Avaya Inc. maintains that if damages are awarded, they should be prorated and cites *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773, 777 (Texas 1974) and *Tidwell v. Toyota Auto Mart, Inc.*, 375 N.E.2d 540 (Ill. App. 1978) for support. In these cases, the plaintiffs were terminated from their employment prior to the end of the year after which an annual bonus was due. The courts awarded the plaintiffs a prorated share of an annual bonus. These cases, however, provide support for the Court's determination of liability, but do not provide guidance as to the proper measure of damages.

The Court determines that, where, without fault on their parts, Plaintiffs, who were willing to perform by staying in their jobs until March 31, 2005, were prevented from doing so when Avaya Inc. terminated their employment, they are entitled to be placed in as good a position as they would have been in had the contract been performed. The primary measure of damages is the amount of his or her loss, or, in other words, the value of his or her ERBP contract. *See Parish & Bingham Corp. v. Jackson*, 16 Ohio App. at 4; *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.*, 151 Ohio St. 522, 86 N.E.2d 782, Syl. ¶ 1 (Ohio 1949)(holding that a defendant's repudiation of a contract, plaintiff is entitled to recover damages for defendant's breach of contract and such damages may include the further compensation plaintiff would have received under the contract if

-14-

it had been performed, less the value to plaintiff of his being relieved of the obligation of completing performance);  Restatement (Second) of Contracts, § 253 ("Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.")  Comment a to Restatement (Second) of Contracts, § 253 provides the following illustrative explanation:

> An obligee under a contract is ordinarily entitled to the protection of his expectation that the obligor will perform. For this reason, a repudiation by the obligor under § 250 or § 251 generally gives rise to a claim for damages for total breach even though it is not accompanied or preceded by a breach by non-performance. . . .
>
> Illustrations:
>
> 1. On April 1, A and B make a contract under which B is to work for A for three months beginning on June 1. On May 1, A repudiates by telling B he will not employ him. On May 15, B commences an action against A. B's duty to work for A is discharged and he has a claim against A for damages for total breach.

Accordingly, the Court concludes that Plaintiffs are entitled to the full value of the retention bonus.

## III.

For the foregoing reasons, Defendant's Motion for Summary Judgment as to Plaintiff Shreve's breach of contract claim is **GRANTED**; the remaining Plaintiffs' Motion for Summary Judgment is **GRANTED**; and the Clerk is **DIRECTED** to enter **JUDGMENT** in the following amounts for each remaining Plaintiff:

| | |
|---|---|
| Sandra Chapman | $68,240 |
| Bonnie Cooper | $112,321 |
| Melinda Gaddy | $39,332 |
| Jean Harwood | $75,569 |
| Sherrie Landsberger Kendrick | $81,346 |
| Evelyn Petrus | $102,117 |

| | |
|---|---|
| Michael Prestie, Jr. | $59,596 |
| Daryl Robinson | $56,634 |
| Jane Rocha (Roderick) | $26,901 |

**IT IS SO ORDERED.**

August 21, 2007                  /s/ Edmund A. Sargus, Jr.
**DATED**                          **EDMUND A. SARGUS, JR.**
                                   **UNITED STATES DISTRICT JUDGE**